UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
_____

ALFRED BIERKLE,    No. 2:21-cv-12743

       Plaintiff,    Hon.

v.

U.S. COAST GUARD NATIONAL
POLLUTION FUNDS CENTER, U.S.
DEPARTMENT OF HOMELAND
SECURITY, and UNITED STATES
OF AMERICA,

       Defendants.
_____/

## COMPLAINT

Plaintiff Alfred Bierkle seeks relief under the Administrative Procedures Act setting aside an agency determination that he is liable for a debt of $637,078.68 under the Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "Debt"). The Debt is the result of a final administrative decision by the National Pollution Funds Center (NPFC) and the Department of Homeland Security (DHS) that Bierkle was the responsible party for the costs to cleanup a small, residential oil spill in Lake St. Clair. Bierkle seeks to set that determination aside because the agencies failed to locate the source of the oil spill, did not undertake any meaningful investigation to confirm the actual source of the release, and wrongly concluded that Bierkle did not qualify for a complete statutory defense to liability under 33 U.S.C. § 2703.

1

## Jurisdiction and Venue

1. Plaintiff Alfred Bierkle seeks declaratory relief pursuant to 5 U.S.C. § 706(2), 28 U.S.C. § 2201, and Fed. R. Civ. P. 57 to hold unlawful and set aside the NPFC's March 31, 2021 determination that the Debt is "valid and owing."

2. This Court has jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States and 28 U.S.C. § 1346 because this action is against the United States of America.

3. Plaintiff has a right to judicial review under 5 U.S.C. § 701, *et seq.*

4. Venue is proper in this Court under 33 U.S.C. § 2717(b), because the oil spill at issue in this matter took place within this District.

## Parties

5. Alfred Bierkle is an individual currently residing in Fort Lauderdale, Florida. Since February 1992, Bierkle has also owned a private residence located at 22640 Statler Street, St. Clair Shores, Michigan. During the time at issue in this case, the St. Clair Shores home was Bierkle's primary residence.

6. NPFC is a division of the United States Coast Guard operating under DHS. NPFC is responsible for administering the Oil Spill Liability Trust Fund, which was established by the Oil Pollution Act (the "Act"), as well as conducting administrative reviews of disputed debts for cleanup and response costs.

7. DHS is an executive department and authority of the United States Government.

8. NPFC and DHS are both agencies, as that term is defined in 5 U.S.C. § 701(b)(1).

9. The United States of America is properly named as a Defendant in this action under 5 U.S.C. § 702.

## Background

### The Coast Guard investigates an oil discharge into Lake St. Clair.

10. Upon information and belief, on or about February 21, 2019, the U.S. Coast Guard and the Michigan Department of Environmental Quality (MDEQ)[1] responded to a reported oil discharge into Lake St. Clair from a private residence located at 22634 Statler Street, St. Clair Shores, Michigan.

11. The Coast Guard and MDEQ's initial determination was that the oil appeared to be "motor oil" or "home heating oil" that was being pumped into the lake by a residential sump pump. The responding officers estimated that 5-10 gallons had been pumped into the lake, and decided to return the next day to investigate.

---

[1] MDEQ has since changed its name to the Department of Environment, Great Lakes & Energy (EGLE).

12. When they returned the next day, the officers pumped the oil into a tank and began an investigation into the possible source of the oil.

13. Plaintiff Bierkle lived next door to the property where the discharge took place.

14. As part of the officers' investigation, they knocked on Bierkle's door to discuss the cleanup and to ask whether Bierkle had seen anything that could be the cause of the spill.

15. Bierkle responded that he did not know of any potential source, but in an effort to be as cooperative and helpful as possible, offered to walk his property with the investigators.

16. While Bierkle and the investigators were walking Bierkle's property, Bierkle pointed out various features of the property, including an unidentified metal object imbedded in his driveway. The investigators responded that they thought that the metal object might be a fill port.

17. Bierkle had no knowledge of whether the item was a fill port or what might be underneath it.

18. The MDEQ investigators then used ground penetrating radar technology to investigate what might have been under the metal object and discovered the likely presence of an underground storage tank beneath Bierkle's driveway (the "UST").

4

19. Prior to this discovery, Bierkle had never had any knowledge in the 27 years that he had owned that property that there was a UST underneath the driveway.

20. Because the UST was underneath Bierkle's driveway, it was in the front of his property, and on the side of his house furthest from Lake St. Clair and where the neighbor's sump pump was discharging oily water.

21. The Coast Guard and MDEQ investigators nevertheless removed samples from inside the UST as well as from soil surrounding the UST.

22. Shortly thereafter, and apparently based on this alone, the Coast Guard issued Bierkle a letter dated March 7, 2019 informing Bierkle that the UST had been "identified as the source of a pollution incident." The same letter estimated that the Coast Guard's costs to remediate the matter were $175,000, and that Bierkle "may be liable" for those costs.

23. This letter was the first indication Bierkle had received that any investigators had concluded that the UST was the source of the oil discharge. After receiving the letter, Bierkle promptly arranged for and paid to have the UST excavated and removed by an environmental remediation company.

24. Upon information and belief, MDEQ produced a report in May 2019 identifying traces of oil in the samples taken from the UST and surrounding soil.

**A year and a half later, the Coast Guard imposes liability on Bierkle.**

25. It was not until October 1, 2020, that Bierkle received another letter from the Coast Guard, this time informing him that NPFC had "determined that you are liable for [the Coast Guard's removal] costs" under the Act. The letter included the startling revelation that the Debt had now risen to $487,889.09, and referenced "Federal Project / Bill Number G19004-001-21."

26. Bierkle responded to the NPFC through counsel on November 25, 2020 disputing and appealing these charges on several grounds.

27. Bierkle received a response on December 9, 2020 indicating that his appeal would be reviewed by Miguel Bella, acting as an NPFC Review Officer.

28. Bierkle submitted his appeal on March 8, 2021. Bierkle's appeal included a written submission and supporting exhibits.

29. Bierkle's appeal first outlined why the Coast Guard had failed to factually establish the UST as the source of any discharge or release.

30. Bierkle explained that NPFC had not provided any evidence that the oil at issue migrated to the discharge point from the UST.

31. Moreover, it was unclear whether any governmental body had performed any investigation, testing, or analysis that would be in any way sufficient to prove that the oil discharged into Lake St. Clair originated from any underground storage tank, let alone the UST located on Bierkle's property. To the

contrary, upon information and belief, neither the Coast Guard nor MDEQ (or anybody acting on their behalves) ever attempted to determine whether there was such a link.

32. This included no evidence regarding whether groundwater was present at the site of the release or Bierkle's property, and if so the direction of groundwater flow between the UST and the neighbor's sump pump.

33. Investigators had also failed to conduct any soil sampling from any area other than directly adjacent to the UST or the area directly adjacent to the sump pump, meaning the Coast Guard was not able to make any determination that any of the oil from the UST had migrated to the sump pump, or whether there was another, intervening cause of the oily groundwater that had been picked up by the sump pump.

34. Further, upon examination after excavation, the UST itself did not evidence any large-scale or sudden discharge, or the presence of impacted soil or groundwater that would indicate a discharge.

35. Quite the opposite, because Bierkle did not install the UST, it had been underground below Bierkle's driveway for longer than the 27 years Bierkle had owned the property and the UST was still half-full of oil. This oil remaining in the UST was properly removed, characterized, and disposed of when Bierkle had the UST removed in March 2019.

36. The Coast Guard had failed to identify any evidence of any event that would have disturbed the UST and caused the kind of discharge at issue. The UST contained no evidence of any non-aqueous phase liquid or free petroleum product, which would be expected to be present if a large and sudden discharge were to occur. Instead, the tank and adjoining soil were dry, and there was no evidence of any "smear zone", saturated soil, or other field indications of a release associated with the discharge from the neighbor's sump pump. MDEQ personnel and Coast Guard contractors were at the scene during the removal of the UST, and would have made note of any such indications of a release. They did not because there was none.

37. It also appeared that NPFC had not investigated any other potential sources of the discharge. In fact, neither the Coast Guard nor MDEQ made any attempt to determine whether there was an underground storage tank at the property where the discharge occurred, which would have been the most likely source of the discharge. The discharge took place in an area with homes old enough that many are likely to have underground heating oil tanks.

38. It is well-known that the land on which both Bierkle's property and the neighboring property stood also used to be used as a landfill, and thus might have contained other old and disposed sources of oil. Neither the Coast Guard nor MDEQ undertook any investigation of the property where the discharge took place

to determine if there was an alternate source. Both the Coast Guard and MDEQ also had access to historical records (such as aerial photos) that should have caused them to at least consider and investigate alternative causes of the discharge.

39. Bierkle's appeal pointed out that the Coast Guard had not considered any of these other potential sources before reaching its determination that the UST under Bierkle's driveway was the source.

40. Bierkle's appeal also argued that even if the UST were the source of the discharge, that Bierkle was plainly not responsible under 33 U.S.C. § 2703.

41. Under that statute, Bierkle was exempted from liability if the source of the oil had been placed there before he owned the property; he did not know the oil was there and did not have good reason to know the oil was there; and if he had provided full cooperation, assistance, and facility access to the investigators.

42. In support of this statutory defense, Bierkle's appeal included a declaration from Bierkle affirming that he had never known about the UST and had no reason to learn of its existence when he purchased the property.

43. Bierkle also submitted the warranty deed from February 1992, when he purchased the property, and MDEQ and the Coast Guard records affirming that Bierkle had been fully cooperative in the investigation.

44. Indeed, it was Bierkle himself who had pointed out the metal object in his driveway to investigators in the first place.

9

**The NPFC denies Bierkle's appeal.**

45. NPFC denied Bierkle's appeal in a short letter dated March 31, 2021.

46. In rejecting Bierkle's argument that the Coast Guard had not adequately established a factual basis for concluding that the UST was the source of the discharge, the reviewing officer pointed to the fact that the oil discovered in the UST and in the discharge were of the "same type." But even that statement was unsupported, and did nothing to show that another nearby source would not have also contained the "same type" of oil.

47. In doing so, NPFC failed to respond to Bierkle's many arguments regarding other potential sources of this type of oil (such as other underground storage tanks in the area) or the evidence indicating that the UST on Bierkle's property had not suffered any type of acute release.

48. NPFC also denied Bierkle's argument that he qualified for the statutory exception to liability under 33 U.S.C. § 2703 based on the "obviousness of the presence of a cap in the middle of the driveway and the ability to detect the UST by appropriate inspections."

49. NPFC did not address the fact that the Coast Guard was only able to identify the UST below the metal cap by relying on MDEQ's use of ground penetrating radar technology, which was only then confirmed when Bierkle undertook to demolish his driveway and excavate the site to remove the UST.

Instead, NPFC simply concluded that "[b]ased on the location of the cap, the presence of a UST was reasonably ascertainable if an inquiry of the cap in driveway would have been conducted."

50. The reviewing officer's letter did not explain why or how Bierkle should have known to conduct an "inquiry" of such a mundane part of his property, especially when, during the 27 years he had owned the property, there had never been any evidence that there was anything of significance under the cap. Bierkle had never filled the UST, nor was there any evidence that heating oil or diesel fuel had ever been delivered to the property during Bierkle's ownership.

**NPFC's denial of Bierkle's appeal constituted final agency action.**

51. NPFC's March 31, 2021 letter concluded that after appeal the Debt remained "valid and owing" and that it would be "referred to either DMS [Debt Management Services within the Department of Treasury] or DOJ for further collection action."

52. This letter constituted a final agency action.

53. Bierkle's counsel called Bella on April 23, 2021 to confirm as much. On that call, Bella confirmed that NPFC and DHS would not be reopening an administrative review of the Debt.

54. NPFC's March 31, 2021 denial of Bierkle's appeal thus constituted the exhaustion of Bierkle's administrative remedies.

11

55. On or about October 6, 2021, Bierkle received a notice from a private debt collection agency contracted by the Department of Treasury to collect the Debt on behalf of DHS. The notice stated that the "entire unpaid balance of your debt is due and payable." The letter also informed Bierkle that the Debt had apparently grown to $637,078.68, without detail or explanation of why the amount due had grown by $150,000.

## Count I
### Relief under the Administrative Procedures Act holding unlawful and setting aside the Debt under 5 U.S.C. 706(2) and 33 U.S.C. § 2702(a)

56. Bierkle incorporates by reference each and every allegation set forth in the preceding paragraphs of this complaint.

57. Under the Act, 33 U.S.C. § 2702(a), only the "responsible party for a . . . facility from which oil is discharged" may be held liable for cleanup costs.

58. To establish that an individual is a responsible party, the NPFC must be able to show that there was a discharge of oil from a facility, the source of that discharge, and the responsible party for that source.

59. The NPFC failed to satisfy this burden here because it did not establish by a preponderance of the evidence that the oil discharged from Bierkle's property.

60. As a result, NPFC and DHS's determination that Bierkle qualified as a responsible party under 33 U.S.C. § 2702(a) was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

61. NPFC and DHS's determination was also unwarranted by the facts.

62. Based on the foregoing, a real, actual, and substantial controversy exists between Bierkle and Defendants as to whether the Debt at issue is "valid and owing" as to Bierkle.

63. The Court should hold unlawful and set aside NPFC's and DHS's determination that the Debt at issue is "valid and owing" as to Bierkle under 5 U.S.C. § 706.

## Count II
### Relief under the Administrative Procedures Act holding unlawful and setting aside the Debt under 5 U.S.C. 706(2) and 33 U.S.C. § 2703

64. Bierkle incorporates by reference each and every allegation set forth in the preceding paragraphs of this complaint.

65. Even if NPFC had adequately determined that the UST was the cause of the oil discharge at issue, Bierkle would still have a complete statutory defense to any liability for the Coast Guard's cleanup costs.

66. Under the Act, 33 U.S.C. § 2703, a responsible party has a "complete defense" to liability under the Act if it is more likely than not that a third party is responsible by act or omission.

13

67. This subpart of the statute is known as the "innocent landowner" defense, and provides that as long as the discharge was caused by a prior landowner, there is no liability for the current owner if the oil was placed on the property before the owner acquired the property; the current owner did not know the oil was there or have good reason to know the oil was there; and the current owner provided full cooperation, assistance, and facility access to the persons that are authorized to conduct removal actions. *Id.* at §§ 2703(a), (a)(3), & (d)(1-4).

68. Bierkle qualifies for this statutory exception because, to the extent the UST caused the discharge here, it was placed beneath Bierkle's property prior to his possession of the property; he did not know of the UST's existence under his property and had no good reason to know of its existence; and he fully cooperated, assisted, and provided access to investigators.

69. This is all the more true in light of the fact that Mr. Bierkle purchased the Neighboring Property prior to May 31, 1997.

70. The Act, 33 U.S.C. § 2703(d)(4)(D)(i), requires that when the real property at issue was acquired prior to May 31, 1997, that the NPFC take into account several factors that mitigate a landowner's potential liability. Those factors include whether the landowner possesses any specialized knowledge or experience that would make it more likely that he had reason to know of the oil's existence; whether information about the oil's presence was "commonly known"

14

or "reasonably ascertainable"; the "obviousness of the presence" of the oil; and the landowner's ability to detect the UST.

71. These factors all should have dictated against finding Bierkle liable for the costs at issue.

72. NPFC and DHS's determination that Bierkle was ineligible for the innocent landowner defense under 33 U.S.C. § 2703 was thus arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

73. NPFC and DHS's determination was also unwarranted by the facts, and was in excess of statutory authority and limitations.

74. Based on the foregoing, a real, actual, and substantial controversy exists between Bierkle and Defendants as to whether the Debt at issue is "valid and owing" as to Bierkle.

75. The Court should hold unlawful and set aside NPFC's and DHS's determination that the Debt at issue is "valid and owing" as to Bierkle under 5 U.S.C. § 706.

## Requested Relief

Bierkle requests the following relief from this Court:

A. A declaration that the Debt is not valid and owing;

B. A declaration holding unlawful and setting aside NPFC and DHS's determination that Bierkle is liable for the Debt;

  C. A declaration that under 33 U.S.C. § 2702 Bierkle is not a "responsible party," and is thus not liable for any portion of the Debt and/or Federal Project / Bill Number G19004-001-21;

  D. A declaration that even if Bierkle were a "responsible party," that he is entitled to a complete statutory defense under 33 U.S.C. § 2703, and is thus not liable for any portion of the Debt and/or Federal Project / Bill Number G19004-001-21;

  E. Reimbursement of Bierkle's reasonable and actual fees and costs (including attorneys' fees) incurred as a result of having to file and maintain this action; and

  F. Any and all other relief that the Court determines is just and appropriate.

            WARNER NORCROSS + JUDD LLP

Dated: November 24, 2021   */s/Adam T. Ratliff*
            Michael G. Brady (57331)
            Kurt M. Brauer (P54061)
            Adam T. Ratliff (P79892)
            2715 Woodward Ave., Ste. 300
            Detroit, Michigan 48201
            313.546.6000
            mbrady@wnj.com
            kbrauer@wnj.com
            aratliff@wnj.com

>Gaëtan Gerville-Réache (P68718)
>WARNER NORCROSS + JUDD LLP
>150 Ottawa Ave., NW, Suite 1500
>Grand Rapids, Michigan 49503
>616.752.2000
>greache@wnj.com
>
>*Attorneys for Plaintiff Alfred Bierkle*