UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ALFRED BIERKLE,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>U.S. COAST GUARD NATIONAL POLLUTION FUNDS CENTER et al.,<br><br>　　　　　Defendants. | Case No. 21-cv-12743<br>Honorable Shalina D. Kumar<br>Magistrate Judge Anthony P. Patti |

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 32), DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 33), AND DENYING AS MOOT PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD (ECF NO. 24)**

I.  INTRODUCTION

Plaintiff Alfred Bierkle sues defendants U.S. Coast Guard National Pollution Funds Center ("NPFC" or "the agency") and the Department of Homeland Security ("DHS") (collectively "the government"). ECF No. 1. Bierkle seeks to set aside an agency determination that under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, he is liable for $637,078.68 in pollution removal costs associated with an oil spill, arguing that NPFC failed to locate the source of the oil spill, did not undertake any meaningful

investigation to confirm the actual source of the spill, and wrongly concluded that he did not qualify for a complete statutory defense under 33 U.S.C. § 2703. *Id*.

The Court determined that phased motions for summary judgment were appropriate because the asserted statutory defense presents a purely legal dispositive issue. ECF No. 31. Accordingly, it ordered the parties to first file cross-motions for summary judgment as to the statutory defense. *Id*.[1] The parties did so. ECF Nos. 32, 33. Those motions are fully briefed and ripe for decision. ECF Nos. 35, 36, 37, 38.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

In February 2019, the St. Clair Shores Fire Department notified the U.S. Coast Guard of a suspected oil spill on Lake St. Clair. ECF No. 33, PageID.1915. Investigating state and federal agents determined that a sump pump from the property neighboring Bierkle's residence on Statler Street was discharging light fuel oil into the lake. *Id*. As part of their investigation, these agents questioned Bierkle about potential sources of the oil discharged into the lake. *Id*. Bierkle told the agents he knew nothing

---

[1] Pursuant to the Court's March 2023 order, Bierkle's pending motion to supplement the record (ECF No. 24) would be decided, and a second phase of summary judgment motions on the fact-intensive Count I of the complaint would be ordered, if necessary, after the Court decided the first phase of summary judgment motions.

about the discharge and walked with the agents as they inspected his property. *Id*. Bierkle pointed out an unidentified metal object embedded in his driveway, which the investigators thought might be a fill port cap to an underground storage tank. *Id*.

The investigators removed the cap and retrieved samples of fluid, which testing revealed to be oil. *Id*. at PageID.1916. After a state contractor confirmed the location and size of an underground storage tank ("UST"), Bierkle hired an excavating company to remove the UST from beneath his driveway. *Id*. Coast Guard personnel who observed the removal of the UST from Bierkle's driveway noted the presence of oil contamination within the hole from which the tank was removed. *Id*.

In March 2019, NPFC sent Bierkle a letter notifying him that he could be responsible for $175,000 in costs incurred to date for removing the pollution in Lake St. Clair. *Id*. at PageID.1917. More than a year and a half later, in October 2020, NPFC sent Bierkle another letter informing him that the UST had been identified as the source of the pollution in the lake and that he was therefore responsible for the pollution removal costs . *Id.* That letter included an invoice with itemized expenses in the amount $487,889.09. *Id*. Bierkle disputed his responsibility for pollution removal costs in a November 2020 letter stating that he had resided in his home for

several decades and was never aware that the UST was beneath his driveway. *Id.*

NFPC initiated the administrative review process and invited Bierkle to provide evidence and argument related to the pollution removal costs the government assessed against him. *Id*. at PageID.1918. Bierkle submitted written arguments contesting his responsibility for pollution removal costs, including four exhibits: 1) his declaration; 2) the warranty deed for his residential property; 3) Response Situation Reports from the Coast Guard; and 4) a letter from the State of Michigan to Bierkle's neighbor on Statler Street. *Id*.

Bierkle, under penalty of perjury, swore in his declaration that he purchased his property on Statler Street in 1992. ECF No.13, PageID.222. He declared that he purchased the residence from his now-deceased brother, who had owned it only a short time and never lived there. *Id*. He also testified that he purchased the residence after a property inspection typical for a residential purchase. *Id*. Bierkle declared that he did not own, use, or service watercraft that would have been fueled by a UST. *Id*. He also was not aware of such a use by a previous owner of the property. *Id*. According to Bierkle, he "did not conduct any type of environmental due diligence because I was not required to and was not aware of any reason

such due diligence would be necessary." *Id*.

In March 2021, NPFC issued its determination on the administrative review, finding that Bierkle was a responsible party[2] and that he was not entitled to any statutory defense to liability. ECF No. 33, PageID.1918. The agency determined that the presence of the fill cap in the middle of the driveway was obvious and that Bierkle would have learned of the presence of the UST had an appropriate inspection or reasonable inquiry been conducted. *Id*. at PageID.1919. According to the agency, Bierkle failed to satisfy the requirements for the statutory defense to liability by not conducting appropriate inquiries at the time he purchased the Statler Street property. *Id*.

Bierkle did not pay the assessed pollution removal costs, so the agency referred the debt, which had then risen to $634,789.10, to the Department of the Treasury for collection. *Id*.; ECF No. 13, PageID.267. Bierkle initiated this action for relief from this debt.

### III.   ANALYSIS

---

[2] Because this motion is limited to Bierkle's argument that he has a complete statutory defense to pollution removal cost liability, arguments regarding whether Bierkle was appropriately deemed a responsible party under OPA will be entertained in later proceedings, if necessary. For the purposes of this motion, the parties and the Court assume that Bierkle is a responsible party under the statute. *See* ECF Nos. 31, 32, 33.

### A. Standard of Review

The familiar rules governing summary judgment do not apply when a district court reviews a final agency action under the Administrative Procedure Act ("APA"). *Oak Ridge Environmental Peace Alliance v. Perry*, 412 F. Supp. 3d 786, 808 (E.D. Tenn. 2019). Instead, courts review whether the agency action was "[1] arbitrary, capricious, [2] an abuse of discretion, or otherwise [3] not in accordance with law." 5 U.S.C. § 706(2)(a).

> An agency decision is considered arbitrary and capricious if
>
> it has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The arbitrary-and-capricious standard is a narrow one; courts are "not to substitute [their] judgment for that of the agency." *Id*. Instead, courts "must canvass the record to determine whether there exists a 'rational connection between the facts found and the choice made.'" *Alliance for Cmty. Media v. F.C.C.*, 529 F.3d 763, 786 (6th Cir. 2008) (quoting *State Farm*, 463 U.S. at 43).

"Agency action is 'not in accordance with the law' when it is in conflict

with the language of the statute relied upon by the agency." *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007). Whether agency action is consistent with the applicable statute "is an inquiry distinguishable from traditional arbitrary-and-capricious review." *Nat'l Truck Equip. Ass'n v. Nat'l Hwy. Traffic Safety Admin.*, 711 F.3d 662, 668 (6th Cir. 2013).

### B. Statutory Framework

The OPA is a federal statute addressing liability and compensation for oil spills. 33 U.S.C. § 2701 *et seq.* Under the OPA, each "responsible party for a . . . facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs . . . that result from [the discharge]." 33 U.S.C. § 2702(a). A "facility" is "any structure, group of structures, equipment, or device . . .which is used for . . . storing, handling, transferring, processing, or transporting oil . . . ." *Id.* § 2701(9). "Responsible party" is defined as "any person owning or operating the facility." *Id.* § 2701(32)(B).

The OPA provides that a responsible party is not liable for removal costs under § 2702, "if the responsible party establishes, by a preponderance of the evidence, that the discharge . . . of oil and the resulting . . . removal costs were caused solely by . . .an act or omission of a third party." *Id.* § 2703(a)(3). For the purposes of this defense, the act or

omission of the third party cannot be in connection with any contractual relationship with the responsible party. *Id.*

The statute defines "contractual relationship" as including land contracts, deeds, easements, leases, or other instruments transferring title or possession, unless (1) the responsible party acquired the real property where the facility at issue is located "after the placement of the oil on, in, or at the real property" and (2) "at the time the responsible party acquired the real property . . . the responsible party did not know and had no reason to know that oil. . . was located on, in, or at the facility." *Id.* §§ 2703(d)(1)(A)-(B) & (d)(2)(A). For property purchased for residential use, an "inspection and title search of the facility and the real property . . . that reveal no basis for further investigation" satisfies the requirements of "no reason to know." *Id.* § 2703(d)(4)(E).

To take advantage of this statutory defense, known colloquially as the innocent landowner defense, a responsible party must also establish by a preponderance of the evidence that he exercised due care with respect to the oil concerned and took precautions against foreseeable acts or omissions of a third party and the foreseeable consequences of those acts and omissions. *Id.* § 2703(d)(3)(A) (citing *id.* § 2703(a)(3)). The innocent landowner must also establish by a preponderance of the evidence that he

"has provided full cooperation, assistance, and facility access" for removal actions, "is in compliance with land use restrictions established or relied on in connection with the removal action[,] and has not impeded the effectiveness" of the removal action. *Id.* § 2703(d)(3)(B)-(D).

### C. Application of Innocent Landowner Defense

Bierkle argues that he invoked and qualified for the innocent landowner defense to liability for pollution removal costs associated with the oil discharge into Lake St. Clair and that the government's rejection of that defense was arbitrary, capricious, and not in accordance with § 2703. The Court agrees.

As an initial matter, the parties agree that, due to a dearth of case law interpreting OPA, courts look to the analogous provision in the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, when analyzing an OPA innocent landowner defense. *See United States v. HVI Cat Canyon, Inc.*, 314 F. Supp. 3d 1049, 1074 n.31 (C.D. Cal. 2018); *Buffalo Marine Services Inc v. United States*, 663 F.3d 750, 755 (5th Cir. 2011). The parties also agree that the initial legal dispute here is whether the third party causing the spill did so "in connection with any contractual relationship" with Bierkle. 33 U.S.C. § 2703(a)(3); *see* ECF No. 32, PageID.1903-05; ECF No. 36,

PageID.1990. If Bierkle is not connected with a contractual relationship to the spill-causing third party, he is entitled to the complete defense[3] without further review under other subsections of the statute. *See* 33 U.S.C. § 2307(a)(3).

Bierkle argues that he had no contractual relationship with the third party whose act or omission caused the oil discharge because the party who deeded him the Statler Street property also had not installed or known about the "facility," the UST under the property's driveway. ECF No. 32, PageID.1903-05 (citing ECF No. 13, PageID.222). The government counters that, for innocent landowner defense purposes, Bierkle had a contractual relationship with all previous owners in the Statler Street property's chain of title. ECF No. 36, PageID.1994-96 (citing *California Dep't of Toxic Substances Control v. Westside Delivery, LLC*, 888 F.3d 1085, 1092 (9th Cir. 2018)).

The Court need not resolve this dispute, however, because, even if Bierkle were connected by a contractual relationship to whomever installed the UST under the driveway, he still qualified for the complete defense

---

[3] The additional conditions required for the complete defense under § 2703(a)(3)—that the responsible party exercised due care with respect to the oil concerned and took precautions against the third party's foreseeable acts or omissions and the foreseeable consequences of those act and omissions—are not in dispute here.

under other provisions of the statute. Bierkle acquired the Statler Street property after the placement of the oil in the UST. *See* 33 U.S.C. § 2307(d)(1)(A). Bierkle provided full cooperation, assistance, and access to removal authorities. ECF No. 13, PageID.221.[4] Thus, even if Bierkle is a responsible party in a contractual relationship with a third party in connection with the oil spill, he is entitled to the innocent landowner defense if he did not know and had no reason to know that the oil that discharged into Lake St. Clair was located on, in, or at the UST on his property. *See id.* § 2307(d)(2)(A).

Bierkle argues that he had no reason to know that the UST, or the oil inside it, was on his property because he purchased it after a title search[5] and an inspection undertaken in 1992 revealed no basis for further investigation. Indeed, as noted above, that is all that is required of a responsible party who purchased a property for residential use. *See id*. § 2703(d)(4)(E). The government asserts the inspection did reveal a basis

---

[4] The government never argued, and the record does not suggest that Bierkle's conduct otherwise disqualified him from the innocent landowner defense. *See* 33 U.S.C. §§ 2307(a)(3) & (d)(3).

[5] Bierkle asserts that the conveyance of the Statler Street property by warranty deed required that a title search be conducted. *See* ECF No. 32, PageID.1906 (citing ECF No. 13, PageID.225).

for further investigation, namely the fill cap embedded in Bierkle's driveway. ECF No. 36, PageID.1996 (citing ECF No. 13, PageID.255). The Court finds this argument unavailing.

Bierkle's declaration clearly states that he purchased the Statler Street property based on an inspection typical for a residential property. ECF No. 13, PageID.222. That inspection did not alert Bierkle to any reason that further environmental due diligence would be necessary. *Id*. That state and federal pollution investigators searching for an underground source of the discharged oil identified the fill cap in the driveway as belonging to a UST is not evidence, as the government suggests, that the fill cap was a basis for additional environmental inspection in 1992 when Bierkle purchased the property. First, the government offers no evidence that either Bierkle or the residential property inspector was aware of the non-descript metal disc embedded in and flush with the surface of the driveway,[6] or that a typical residential property inspector would examine a property for objects such as the fill cap present at the Statler Street property. *See* ECF No. 13, PageID.247. Second, although the agency

---

[6] The government's suggestion that Bierkle must have known the metal object was in the driveway when he purchased the home in 1992 because he knew it was there in 2019 is not convincing. It ignores the possibility that Bierkle discovered the object sometime in the intervening 27 years. ECF No. 38, PageID.2021.

concluded that "the presence of a UST was reasonably ascertainable if an inquiry of the cap in the driveway would have been conducted," ECF No. 13, PageID.255, the government offers no evidence that in 1992, a typical residential inspector would have the expertise to identify a metal object like the fill cap as something warranting further investigation. The government's arguments suggesting these possibilities do not rebut the evidence of Bierkle's declaration, which avers that a residential property inspection was completed and did not provide a reason to conduct further environmental investigation. *See id*. at PageID.222.

The government argues that, even if the inspection provided no basis for further inquiry, the required title search revealed a basis for further investigation. To support this argument, the government cites a 1997 building permit for renovating a boat house into additional living space at the Statler Street property. ECF No. 22, PageID.1779-80. Even if a building permit would be recorded and thus detectable in a title search, a 1997 document would certainly not have been included in a 1992 search. This document could not have revealed a basis for further investigation in 1992. Moreover, the government does not explain how the existence of a boathouse on the residential property would impact the question of whether an inspection and title search of Statler Street property would reveal a

basis for further investigation.

The government also cites an MDEQ summary report noting that "the UST "was apparently historically used to fuel boats in the residence's boat house." ECF No. 19-1, PageID.1621. Again, the government does not explain or offer evidence on how an inspection and title search would have revealed this conjectured past use. The government does not contest that Bierkle did a title search, nor does its cited evidence show that the required title search would have revealed a basis for further investigation.[7]

In sum, Bierkle provided evidence, in the form of his sworn declaration, that an inspection typical for a residential property had been conducted before he purchased the Statler Street property, and that the inspection did not alert Bierkle to any reason that further environmental due diligence would be necessary. ECF No. 13, PageID.222. The government offers argument, but no evidence, to rebut Bierkle's testimony. Accordingly, Bierkle showed by a preponderance of the evidence that he did not know and had no reason to know that the oil that discharged into Lake St. Clair

---

[7] Further, even if this evidence could have shown that the title search revealed a basis for further investigation, the Court could not consider or rely upon it to uphold the agency's decision because the agency decision did not invoke it as grounds for its decision. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding a reviewing court can only evaluate the agency decision based on the grounds actually invoked by the agency).

was located on, in, or at a UST on his property and was thus entitled to the complete defense for innocent landowners under the OPA.

### D. Strict Liability

The government argues that even if Bierkle is entitled to the innocent landowner defense, "a party who successfully establishes that a third party is solely responsible must still pay removal costs and damages to any claimants." *Crimson Pipeline Mngmt., Inc. v. Herzog Contracting Corp.*, 2012 WL 13013025, at *6 (C.D. Cal. Oct. 10, 2012). Citing *Crimson* and § 2702(d)(1), the government asserts that the OPA requires Bierkle to pay the government and then seek reimbursement through subrogated rights against the third party or through other means.[8]

*Crimson* is readily distinguishable, however, because it does not concern an innocent landowner. Instead, Crimson, the party asserting the OPA third-party defense, owned a crude oil pipeline. 2012 WL 1303025, at *1. Certain oil-related entities, including "any person owning or operating a pipeline," are per se responsible parties under § 2701(32). *Id*.

> [T]he statutory scheme works by holding entities directly involved in the oil industry (all per se "responsible parties") strictly liable for oil spills. Per se responsible parties, such as a pipeline, can shift liability to third parties who solely cause a spill . . . . Shifting liability to a third party gives the per se responsible party

---

[8] In particular, Bierkle may assert a claim against the Oil Spill Liability Trust Fund.

subrogation rights . . . against the third party.

*Id*. at *6.

Unlike a pipeline owner, a subsequent purchaser of a facility or property who can establish it did not know and had no reason to know that oil was present—that is, an innocent landowner—is not strictly liable under the OPA. *See City of Banning v. Dureau*, 2013 WL 12114827, at *3 (C.D. Cal. July 11, 2013). Bierkle was not a pipeline owner or operator. As a subsequent purchaser of a residential property with no reason to know that oil was present on the Statler Street property, Bierkle is not subject to strict liability.

Nor does § 2702(d)(1) yoke an innocent landowner with strict liability.

> [I]n any case in which a responsible party *establishes* that a discharge . . . and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties described in section 2703(a)(3*)* . . . , the third party or parties shall be treated as the responsible party or parties for purposes of determining liability under this subchapter.

33 U.S.C. § 2702(d)(1)(A) (emphasis added). In contrast, § 2702(d)(1)(B) dictates that if the responsible party *alleges* that the discharge was caused solely by an act or omission of a third party, the responsible party shall pay the pollution removal costs and then seek recovery of those costs from the third party by way of subrogation. Thus, when faced with claims caused by a third party,

"the responsible party can either *establish* that a third party was the sole cause and liable for any removal costs and damages pursuant to § 2702(d)(1)(A) or *allege* that a third party was the sole cause, pay the claims properly presented in accordance with § 2713 and be subrogated to the rights of those claimants paid pursuant to § 2702(d)(1)(B)." *Marathon Pipe Line Co. v. LaRoche Industries Inc.*, 944 F. Supp. 476, 479 (E.D. La. 1996).

In other words, § 2702(d)(1) offers responsible parties with claims that a third party was the sole cause of the discharge with two alternatives: they may establish a third party's accountability under § 2703(a)(3) such that the third party becomes the responsible party subject to liability under § 2702, or, if the original responsible party has not or cannot meet the stringent requirements of § 2703(a)(3), it can allege that a third party is the sole cause of the discharge, pay the pollution removal costs and damages, and pursue recovery from the third party by way of subrogation. *See* 33 U.S.C. § 2702(d)(1).

As discussed above, Bierkle established that a third party was the sole cause for the oil discharge under § 2703(a)(3) and that he was thus entitled to the complete defense to strict liability imposed by § 2702. Under § 2702(d)(1)(A), the third party who installed or

operated the UST under the Statler Street property's driveway is now the responsible party. Bierkle need not pay the government the pollution removal costs and then seek recovery from the installer of the UST by way of subrogation.

## IV. CONCLUSION

For these reasons, the Court **DENIES** the government's motion for partial summary judgement and **GRANTS** Bierkle's motion for summary judgment. Bierkle's motion to supplement the administrative record (ECF No. 24) is **DENIED AS MOOT**. The government's determination that Bierkle is liable for pollution removal costs, as well as for any other costs and civil or administrative penalties arising from the February 2019 Lake St. Clair discharge incident is **SET ASIDE**.

s/Shalina D. Kumar  
Shalina D. Kumar  
United States District Judge

Dated: March 21, 2024